## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ATHENS DIVISION

|  |  |
|---|---|
| JERRY TALLENT,<br><br>             Plaintiff,<br><br>v.<br><br>LEXISNEXIS RISK SOLUTIONS INC.,<br>             Defendant. | Case No.: 3:24-cv-00134 |

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

Jerry Tallent ("Plaintiff" or "Mr. Tallent") brings this action on an individual basis, against LexisNexis Risk Solutions Inc. ("Defendant" or "LexisNexis") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et. seq.*, arising out of Defendant's mixing of Plaintiff's credit file with that of another consumer.

## **INTRODUCTION**

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is

intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.    However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Defendant acknowledges this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3.    The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.    These CRAs sell information to readily paying subscribers (*i.e.,* retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.    Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the

personal, private, and financial information that they compile and sell about individual consumers.

6.    "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.    Congress made the following findings when it enacted the FCRA in 1970:

    (a)    The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

    (b)    An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

    (c)    Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

    (d)    There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

8.    Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the

confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10.    Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum

possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his credit and obtaining new credit.

12.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

13.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14.     A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

15.     A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16.     "Mixed files" create a false description and representation of a consumer's credit history.

17.     The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18.     Mixed files are not a new phenomenon. Defendant has been on notice of the existence of mixed files, and the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19.     More recently and by way of example, Experian, a consumer reporting agency like the Defendant, has been the subject of numerous state attorney general actions relating to its mixed file problem.

20.    For example, in 2015, the New York Attorney General filed charges and settled claims with Experian over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

21.    Notwithstanding Experian's notice, which should have alerted Defendant to their similar practices and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, dates of birth, and addresses.

22.    Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both. This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Defendant sells information pertaining to one consumer in response to the application of the other.

23.    Defendant has been sued hundreds of times in recent years wherein an allegation was made that Defendant violated the FCRA. Moreover, Defendant is

---

[1] https://ag.ny.gov/press-release/2015-ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited May 17, 2022; *see also* https://ag-ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited May 17, 2022.

sued, at a minimum, dozens of times per year wherein an allegation is made that Defendant mixed a consumer's credit file with that of another consumer.

24.    FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

25.    For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

26.    In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

27.    In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00

in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

28.    More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

29.    "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co.*

*of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

30.    No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

31.    Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including Defendant, to review their procedures when a mixed file occurs.

32.    Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

33.    Plaintiff's claims arise out of the Defendant's blatantly inaccurate credit reporting, wherein Defendant published in a consumer report about Plaintiff the information of another consumer because Defendant mixed Plaintiff's credit file with that of an unrelated consumer.

34.    Further, Plaintiff's claims also arise out of Defendant's blatantly inaccurate consumer reporting, wherein Defendant permitted the impermissible access to Plaintiff's credit file when it published a consumer report about Plaintiff in response to an insurance application submitted by and pertaining to an unrelated

consumer because Defendant mixed Plaintiff's credit file with that of an unrelated consumer.

35.    Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs consumer reports, in violation of the FCRA, 15 U.S.C. § 1681e(b); for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of a mixed file, and for failing to delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681i; and for selling Plaintiff's consumer report to third parties, whom did not have a permissible purpose to Plaintiff's consumer report, in relation to the insurance applications of an unrelated consumer, in violation of the FCRA, 15 U.S.C. § 1681b(a).

36.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, as described herein.

## **PARTIES**

37.    Jerry Tallent ("Plaintiff" or "Mr. Tallent") is a natural person residing in Monroe, Georgia, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

38.    Defendant LexisNexis Risk Solutions Inc., ("Defendant" or "LexisNexis") is a corporation with a principal place of business located at 1000 Alderman Drive Alpharetta, Georgia 30005, and is authorized to do business in the State of Georgia, including within this District.

39.    LexisNexis is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). LexisNexis is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

40.    The information LexisNexis collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. LexisNexis also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

41.    LexisNexis collects and maintains such information about consumers, whether consumers like it or not. Consumers do not have a choice as to whether LexisNexis collects and maintains information about them. Not only that, but consumers cannot remove information that LexisNexis collects and maintains about them from the LexisNexis database. Further, LexisNexis sells that information about

consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that LexisNexis sold.

## JURISDICTION AND VENUE

42.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

43.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

44.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

45.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

46.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

47.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

48.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## DEFENDANT'S PROCESSING OF CREDIT INFORMATION

49.     Defendant regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

50.     These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

51.    Defendant collects information from thousands of furnishers.

52.    The process by which Defendant receives, sorts, and stores information is largely electronic.

53.    Furnishers report credit information to Defendant through the use of coded tapes that are transmitted to Defendant on a monthly basis through software known as Metro 2.

54.    Defendant takes credit information reported by furnishers and creates consumer credit files.

55.    Defendant maintains credit files on more than 200 million consumers.

56.    Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

## DEFENDANT'S MIXED FILE PROBLEM

57.    Defendant knows that different consumers have similar names.

58.    Defendant knows that different consumers can have similar Social Security numbers.

59.    Defendant knows that different consumers with similar names can also have similar Social Security numbers.

60.    Defendant knows that public records often do contain identifying information such as Social Security numbers or dates of birth.

61.    Defendant matches tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

62.    Defendant accomplishes this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

63.    From time to time, Defendant's matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what's commonly known as in the credit reporting industry as a mixed or merged credit file.

64.    Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including Defendant, regarding its significant failures and deficiencies with respect to mixed files.

65.    Despite Defendant's long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Defendant containing information belonging to another consumer.

66.     A mixed or merged credit file is the result of Defendant's inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

67.     There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by Defendant to match personal identifying information and credit information, including public record information, to a particular consumers' credit file.

68.     The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendant.

69.     A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Defendant.

70.     Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

71.     Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

## FACTUAL ALLEGATIONS

**A.      Plaintiff Attempts to Renew Insurance Policy with GA Farm Bureau**

72.      Plaintiff has retained auto insurance from GA Farm Bureau, year after year, for over 30 years.

73.      In or around June 2024, Plaintiff received an insurance renewal notice from GA Farm Bureau that indicated that his insurance premium would be substantially and dramatically increased.

74.      Surprised and perturbed, in or around June 2024, Plaintiff contacted his insurance agent to inquire about the increase in his insurance premium.

75.      A GA Farm Bureau representative informed Plaintiff that the increase was due to his recent "car wreck" reflected in an insurance claim wherein Plaintiff damaged property while driving under the influence that resulted in the vehicle being "totaled".

76.      Plaintiff, a 61-year-old man, was shocked and confused upon hearing this information, as he had never been in a car wreck, nor has he been involved in a car crash or accident of any kind in at least a two decades.

77.      Plaintiff, befuddled as to why there was such a claim in his file, inquired from GA Farm Bureau as to where it had obtained the obviously erroneous information.

78.    The representative informed Plaintiff that it had obtained the information regarding the claim from Defendant.

79.    Upon information and belief, Defendant sold a consumer report about Plaintiff to GA Farm Bureau that contained an insurance claim, as follows:

```
 Subj/Veh     --CLUE File #--  ---Claim Number---
              -Policy Type & Company-   ----Policy Number----   Claim    Amount
 Date/Age     ------------------- Driver ------------------     Type      Paid
 _____

     1        2220230130111775  227357051                       CO/C    13,577
              PA PROG MOUNTAIN INS CO   934939149                PD/C         0
              -- -------------------    --------------------
 07/04/22     HOUCK, LORI    (P/H)
              ----- ----
 Total Pages 88 of 138                   Page 1                        CD061m-10-19b
```

```
 01yr-10mo    *TALLENT, TERRY (V/O)                    FP:    00/00/00
                 -----
   (  )       328 A BUCKHALTER RD
              --- ---------------
              SAVANNAH       GA   31405-0000
              --------       ----- ----
              DOB: 00/00/00  Sex:       SSN: XXX-XX-XXXX
                 --------    ---        -----------
              Driv. Lic.:                State:
              Vehicle: 16 CHEVROLET SONIC
                    -- -----------------------------
              VIN: 1G1JC5SH6G4185503
                   -------------------------
              Disp.: TOTALED

 If you have questions, contact:
 -----------------------------
 LexisNexis Consumer Center
 P. O. Box 105108
 Atlanta, Georgia 30348-5108
 Telephone: 1-888-497-0011
 C.L.U.E. is a registered trademark of LexisNexis Risk Solutions Inc.
```

**B.    Plaintiff Applies for a New Insurance Polic with Travelers Insurance**

80.    Disheartened by the sudden, unreasonable, and unaffordable increase in his insurance premium, Plaintiff was determined to shop elsewhere, with other insurance providers, and attempt to secure a more reasonable insurance rate.

81.    On or about June 6, 2024, Plaintiff contacted Travelers Insurance to obtain a quote for an insurance policy.

82.    Much to Plaintiff's surprise and dismay, Travelers Insurance quoted Plaintiff a far higher premium than what GA Farm Bureau had offered.

83.    Defeated and in desperate need for auto insurance coverage, Plaintiff relented and renewed his policy with GA Farm Bureau and paid the substantially-increased premium.

**C.    Plaintiff's Mixed File Problem July 2024**

84.    On or about July 8, 2024, Plaintiff requested a copy of his credit file from Defendant.

85.    Soon after, Plaintiff was able to obtain a copy of his credit file from Defendant.

86.    To his utter surprise and dismay, Plaintiff discovered multiple pieces of personal identifying information that did not belong to him

87.    Further, and more damaging to Plaintiff, Plaintiff discovered at least four (4) insurance claims that did not belong to him.

88.    By reporting the aforementioned insurance records and other personal information in the credit file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

**D.    Plaintiff's July 2024 Dispute to Defendant**

89.    Sometime after July 8, 2024, worried that something was very wrong with his credit file, Plaintiff disputed the inaccuracies. Specifically, Plaintiff disputed many items of information that were in his credit file but that did not belong to him. Plaintiff disputed the inaccuracies with Defendant online.

90.    Upon information and belief, Plaintiff specifically disputed the four (4) Automobile Insurance Claim records that were being inaccurately reported by Defendant about Plaintiff.

91.    In his dispute, Plaintiff requested that Defendant reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his credit report.

**E.    Defendant's Unreasonable Dispute Reinvestigation**

92.    On or about August 9, 2024, Defendant responded to Plaintiff's dispute.

93.    Defendant informed Plaintiff that it had reinvestigated Plaintiff's disputes and had verified three out of the four Automobile Insurance Claim records as accurate.

94.    Further, on or about August 14, 2024, Plaintiff received another dispute response from Defendant informing Plaintiff that it had been unable to verify the last of four Automobile Insurance Claim records.

95.    Defendant failed to conduct a reasonable investigation of Plaintiff's July 2024 dispute, or any bona-fide reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

96.    Thereafter, and upon information and belief, Defendant failed to unmix Plaintiff's credit file from that of the other consumer and Defendant continued to report the other consumer's information to Plaintiff's credit file.

97.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; detriment to his credit rating; the expenditure of labor and effort disputing and trying to correct the inaccurate consumer reporting; and emotional distress

including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

## F.    Plaintiff's August 2024 Dispute to Defendant

98.    On or about August 26, 2024, worried that the inaccuracies will continue to negatively affect his insurance premiums and overall creditworthiness, Plaintiff decided to dispute the inaccuracies again with Defendant. Plaintiff disputed with Defendant via phone.

99.    Plaintiff was able to speak with a representative from Defendant on the phone and, over about 85 minutes, they painstakingly reviewed each and every item of unrecognized personal identifying information as well as other pieces of inaccurate information that were reflected in his credit file, including, most notably, the unrecognized auto insurance claims.

100.    Plaintiff requested that Defendant reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his consumer report.

## G.    Defendant's Unreasonable Dispute Reinvestigation

101.    On or about September 20, 2024, Plaintiff received a dispute response from Defendant.

102.   Much like its first response, Defendant informed Plaintiff that it had reinvestigated Plaintiff's disputes and had verified two of three Automobile Insurance Claim records as accurate.

103.   Defendant omitted any response regarding the other inaccurate pieces information that was published in Plaintiff's credit file, such as the many name and address variations, a Social Security number variation, phone numbers, email addresses, insurance policy records, and other information that did not belong to Plaintiff and that had been meticulously disputed with Defendant on the phone.

104.   Defendant failed to conduct a reasonable investigation of Plaintiff's September 2024 dispute, or any bona-fide reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

105.   Thereafter, and upon information and belief, Defendant failed to unmix Plaintiff's credit file from that of the other consumer and Defendant continued to report the other consumer's information to Plaintiff's credit file.

106.   Indeed, a consumer report provided by Defendant to Plaintiff on September 20, 2024, that was purportedly updated in response to Plaintiff's September 2024 dispute, still reflected many name and address variations, a Social Security number variation, phone numbers, email addresses, insurance policy

records, and other information that did not belong to Plaintiff and that had been meticulously disputed with Defendant on the phone.

107.   Specifically, Defendant was reporting the following Automobile Insurance Claim records which did not belong to Plaintiff:

      (a)   Record 1- Terry Tallent

      (b)   Record 2 – Terry Tallent

      (c)   Record 3 – Terry Tallent

108.   Further, Defendant was reporting the following Automobile Insurance Claim records which did not belong to Plaintiff:

      (a)   Record 5 – Terry Tallent
             Owners

      (b)   Record 6 - Terry Tallent
             USAA General Ind. Co.

      (c)   Record 8 – Terry Tallent
             Progressive Groups

      (d)   Record 9 – Terry Tallent
             Progressive Groups

109.   Further, Defendant was reporting the following addresses which did not belong to Plaintiff:

      (a)   111 Aberfeldy St, Savannah, GA 31407¬1607

      (b)   3953 Gadson Dr, Macon, GA 31204¬6307

      (c)   1419 US Highway 321 1 N Apt, Sugar Grove, NC 28679-¬9469

(d)    6060 Kay Dr, Norcross, GA 30093¬1936

(e)    328 Buckhalter Rd A Unit, Savannah, GA 31405¬6112

(f)    4966 Steve Reynolds Blvd, Norcross, GA 30093¬4613

(g)    160 Kibbee Rd, McDonough, GA 30252¬3916

(h)    2010 Northlake Pkwy 1 Apt, Tucker, GA 30084¬7014

(i)    338 Brook Hollow Rd, Boone, NC 28607¬8528

(j)    302 W King St, Boone, NC 28607¬3519

(k)    1656 Meat Camp Rd, Boone, NC 28607¬7260

(l)    711 E Broad St, Savannah, GA 31401¬6023

(m)    111 Aberfeldy St, Port Wentworth, GA 31407¬1607

(n)    111 Aberfeldy St, Prt Wentworth, GA 31407¬1607

(o)    819 5th St S, Monroe, GA 30655

(p)    1503 Washington Ave, Savannah, GA 31404¬4049

(q)    1419 Us Highway 321 N, Sugar Grove, NC 28679¬9469

(r)    711 E Broad A, Savannah, GA 31401¬6112

110.   Further, Defendant was reporting the following name variations that do not belong to Plaintiff:

(a)    Jerry Atallent

(b)    Mr. Jerrly Atallent

(c)    Mr. Terry Atallent

26

(d)    Terry Attalent

(e)    Terry Tallent

(f)    Mr. Terry Tallent

(g)    Mr. Jerry Talent

(h)    Jerry Talent

111.    Further, Defendant was reporting the following phone number which did not belong to Plaintiff:

(a)    (912) 346-8761

112.    Further, Defendant was also reporting the following dates of birth variations that do not belong to Plaintiff:

(a)    0

(b)    xx/01/1962

113.    Further, Defendant was also reporting the following Social Security number variation that does not belong to Plaintiff:

(a)    xxx-xx-3099

114.    Further, Defendant was also reporting the following email addresses that did not belong to Plaintiff:

(a)    terrytallent@aol.com

(b)    jlouman@hotmail.com

115.   By reporting the aforementioned insurance records and other personal information in the credit file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

116.   Further, Defendant reported that Plaintiff applied for insurance on or about August 20, 2024.

117.   Plaintiff did not apply for any insurance policy with any insurance provider on that date. Defendant did not have a permissible purpose for furnishing information about Plaintiff to any insurance provider on the above-referenced date.

118.   Upon information and belief, the inquiry was initiated by insurance applications submitted by an unrelated consumer.

119.   As Plaintiff had not authorized any insurance provider to request Plaintiff's consumer report from Defendant on the above-referenced date in 2024, nor did Plaintiff enter into any business transaction or relationship that otherwise may have provided a basis for an insurance provider to secure a copy of Plaintiff's consumer report from Defendant, Defendant disclosed information about Plaintiff to the above-referenced entities without a permissible purpose and in violation of 15 U.S.C. § 1681b(a).

120.   Upon information and belief, because Defendant continues to mix Plaintiff's credit file with that of the unrelated consumer, Defendant continues to sell Plaintiff's credit file in response to applications and inquiries pertaining to the unrelated consumer.

121.   Upon information and belief, between June 2024 and September 2024, Plaintiff submitted a total of four (4) separate disputes to Defendant, each of which disputed the inaccurate insurance claims.

122.   Upon information and belief, Defendant did not conduct a reasonable reinvestigation in response to any of those four (4) disputes, and continues, still today, reporting inaccurate insurance claim records, and other personal information and personal identifying information that does not belong to Plaintiff.

**H.    Plaintiff Sustained Damages as a Result of LexisNexis' Inaccurate Reporting**

123.   As a result of Defendant's conduct, Plaintiff sustained severe emotional distress. Specifically, Plaintiff has spent an inordinate amount of time dealing with the stress and anxiety caused by the false reporting from Defendant.

124.   Plaintiff has suffered from nights of poor sleep, no sleep, or interrupted sleep as his mind frequently drifts to thoughts of the issues with his LexisNexis report, future issues caused by LexisNexis, and/or other related matters.

125.   Plaintiff has spent hours trying to correct his LexisNexis consumer file and suffered an enormous amount of stress associated with the inaccurate reporting.

126.    Plaintiff was anxious and frustrated because he did not know how to correct his LexisNexis report.

127.    Upon information and belief, because Defendant continues to mix Plaintiff's consumer file with that of an unrelated consumer, Defendant continues to sell Plaintiff's consumer file in response to applications and inquiries pertaining to the unrelated consumer.

128.    As a result of the "mixed file," Defendant made it practically impossible for Plaintiff to obtain affordable insurance.

129.    At all times pertinent hereto, Defendant was acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

130.    At all times pertinent hereto, Defendant's conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

131.    As a standard practice, Defendant does not conduct independent investigations in response to consumer disputes. Instead, it merely parrots the response of the furnishers, despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The

'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

132.    Defendant is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs. Accordingly, Defendant's violations of the FCRA are willful.

133.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit and/or insurance applications of another; loss of ability to purchase and benefit from his safe driving history and decreased insurance risk; increased insurance rates and premiums; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the

inaccurate consumer reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate consumer reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of exorbitant and unaffordable insurance rates, and having another consumer's personal identifying information and background and insurance information, including inquiries, mixed into Plaintiff's credit file.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendant)

134.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

135.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure **maximum possible accuracy** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

136.    On at least one occasion, Defendant prepared patently false consumer reports concerning Plaintiff.

137.   Defendant mixed another consumer's personal and insurance information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness, particularly as applied to insurance and his driving history and level of risk.

138.   Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports and credit files it published and maintained concerning Plaintiff.

139.   As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit and/or insurance applications of another; loss of ability to purchase and benefit from his safe driving history and decreased insurance risk; increased insurance rates and premiums; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate consumer reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate consumer reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of exorbitant and unaffordable insurance rates, and having another consumer's personal

identifying information and background and insurance information, including inquiries, mixed into Plaintiff's credit file.

140.   Defendant's conduct, actions, and inactions was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

141.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendant)**

142.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

143.   The FCRA mandates that Defendant conduct a reasonable reinvestigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The FCRA imposes a 30-day time limit for the completion of such an investigation. *Id*.

144.   The FCRA provides that if Defendant conducts its reinvestigation of disputed information and confirms that the information is, in fact, inaccurate or it is

otherwise unable to verify the accuracy of the disputed information, it is required to delete the item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

145.   Plaintiff initiated a dispute with Defendant and disputed inaccurate information reporting in his credit file and requested that Defendant correct and/or delete the inaccurate, misleading, and highly damaging information belonging to an unrelated consumer.

146.   Upon information and belief, between June 2024 and September 2024, Plaintiff submitted a total of four separate disputes to Defendant that disputed the inaccurate insurance claims.

147.   Upon information and belief, Defendant did not conduct a reasonable reinvestigation in response to any of those four (4) disputes, and continues, still today, reporting inaccurate insurance claim records, and other personal information and personal identifying information that does not belong to Plaintiff.

148.   Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received notice of Plaintiff's dispute; and by failing to maintain reasonable procedures with which to filter and verify information in Plaintiff's credit files.

149.   As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit and/or insurance applications of another; loss of ability to purchase and benefit from his safe driving history and decreased insurance risk; increased insurance rates and premiums; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate consumer reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate consumer reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of exorbitant and unaffordable insurance rates, and having another consumer's personal identifying information and background and insurance information, including inquiries, mixed into Plaintiff's credit file.

150.   Defendant's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

151.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT III
### 15 U.S.C. § 1681b(a)
### Furnishing a Consumer Report Without a Permissible Purpose
### (Third Claim for Relief Against Defendant)

152.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

153.    This action involves the willful, knowing, and/or negligent violation of the FCRA relating to the dissemination of consumer credit and other financial information.

154.    Plaintiff is a "consumer" as defined by the FCRA.

155.    Defendant is a consumer reporting agency that furnishes consumer reports as defined and contemplated by the FCRA.

156.    The FCRA prohibits any consumer reporting agency from furnishing a consumer report unless it has a permissible purpose enumerated under the FCRA, 15 U.S.C. § 1681b(a).

157.    Defendant furnished Plaintiff's consumer report to various entities without a permissible purpose in response to credit applications of another, which did not involve Plaintiff, and which Defendant therefore had no reason to believe that those various credit-issuing entities intended to use Plaintiff's consumer

information in connection with an insurance transaction involving Plaintiff, in violation of 15 U.S.C. § 1681b(a).

158.   Defendant violated 15 U.S.C. § 1681b(a) by selling Plaintiff's consumer report to third parties, whom did not have a permissible purpose to Plaintiff's consumer report, in relation to the insurance application of an unrelated consumer.

159.   s a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit and/or insurance applications of another; loss of ability to purchase and benefit from his safe driving history and decreased insurance risk; increased insurance rates and premiums; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate consumer reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate consumer reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of exorbitant and unaffordable insurance rates, and having another consumer's personal identifying information and background and insurance information, including inquiries, mixed into Plaintiff's credit file.

160.   Defendant's conduct, actions, and inactions was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

161.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

a)    Determining that Defendant negligently and/or willfully violated the FCRA;

b)    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

c)    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and

d)    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: December 26, 2024,        */s/ Jenna Dakroub*
                                 Jenna Dakroub, GA #385021
                                 **CONSUMER JUSTICE LAW FIRM PLC**
                                 260 Peachtree Street NW, Suite 2200
                                 Atlanta, GA 30303
                                 T: (602) 807-1525
                                 F: (718) 715-1750
                                 E: jdakroub@consumerattorneys.com

                                 **CONSUMER JUSTICE LAW FIRM PLC**
                                 8095 N. 85th Way
                                 Scottsdale, AZ 85258

                                 *Attorneys for Plaintiff Jerry Tallent*